# In the United States Court of Federal Claims

### No. 10-859C
### (Filed: January 30, 2013)

* * * * * * * * * * * * * * * * * * * * * * * *

MICHAEL E. STUART,

        Plaintiff,

        v.

THE UNITED STATES,

        Defendant.

* * * * * * * * * * * * * * * * * * * * * * * *

Tucker Act, 28 U.S.C. § 1491(a); Military Pay Act, 10 U.S.C. §§ 204, 206; Discharge from Active Duty; Medical Evaluation; Documentation of Medical Treatment During Active Duty; Department of the Army Personnel Policy Guidance ¶¶ 7-2, 7-8, and 7-12; Army Regulations 40-400, 40-501, 635-40 and 635-200; Remand; Army Board for Correction of Military Records; Medical Evaluation Board.

Jason E. Perry, 114 South Main Street Suite 27, Cheshire, CT, for Plaintiff.

Tony West, Jeanne E. Davidson, Martin F. Hockey, Jr., and Jane C. Dempsey, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, PO Box 480, Ben Franklin Station, Washington, DC, for Defendant. Captain Rachel A. Landsee, U.S. Army Litigation Division, 9275 Gunston Road, Fort Belvoir, VA, Of Counsel.

_____

## OPINION AND REMAND ORDER
_____

**WILLIAMS**, Judge.

Plaintiff, Michael E. Stuart, claims that he was wrongfully discharged from active duty in the United States Army after he became disabled in the line of duty. Plaintiff seeks back pay, payment for medical care since his removal from active duty, and restoration to active duty until he is afforded a medical evaluation.

The case is currently before the Court on Cross-Motions for Judgment on the Administrative Record. The Court concludes that the Army failed to follow its procedures regarding Plaintiff's medical treatment, documentation of medical conditions, and discharge from active duty. Specifically, the Army failed to document Plaintiff's medical treatment while he was deployed and to provide Plaintiff with a medical briefing when he was redeployed, and delayed affording Plaintiff a Post-Deployment Health Reassessment until almost one year after his deployment, in violation of the Army's requirement that this assessment be done within 30

days.  As a result of the Army's failure to follow its procedures, Plaintiff was discharged administratively, for completion of term of service, when he may have been eligible for a discharge because of physical disability.

Accordingly, the Court remands this matter to the Army Board for Correction of Military Records for a determination of whether Plaintiff should have been discharged for medical disability in 2006, under applicable Army Regulations.  The Court defers consideration of Plaintiff's requests for monetary relief until the Board issues its determination.

## <u>Findings of Fact[1]</u>

### <u>Sgt. Stuart's Military Service</u>

Michael Stuart honorably served in the United States Army and Army National Guard for over 20 years, rising to the rank of Staff Sergeant.  AR 186, 232.  He originally joined the Army in 1985, and served on active duty for nine years until 1994, when he joined the Army National Guard as a Sergeant.  AR 279-89.  Sgt. Stuart remained in the National Guard until he was mobilized in 2004, as part of Operation Iraqi Freedom.  AR 232-33, 245-46.  Sgt. Stuart was deployed in Iraq from January to December of 2005, serving as an armor crewman in the 98th Cavalry.  AR 232, 245-46.

While in Iraq, Sgt. Stuart served in a "designated imminent danger pay area." AR 232. On May 20, 2005, Sgt. Stuart was riding in a military convoy when it came under attack and was hit by an improvised explosive device ("IED").  Sworn Statement of Dennis Adams, DA Form 2823, June 25, 2005, AR 77-78.  The IED severely injured the gunner who was atop Sgt. Stuart's vehicle, causing the gunner to fall inside the vehicle and "bleed all over."  AR 77-78.  Sgt. Stuart immediately began providing first aid to the gunner.  AR 77.  Despite being "disoriented and dazed due to the blast," once a "safe distance" away, Sgt. Stuart climbed out of the disabled vehicle, and provided security to prevent a follow-up attack while other members of his unit treated his wounded squadmate.  AR 77.  A helicopter soon arrived to medevac the gunner away. AR 77-78.  According to Sgt. Adams, Sgt. Stuart's superior, Plaintiff and two other crewmembers sought treatment for "headache, very loud ringing in the ears, and hearing loss" at the Battalion Aid Station the next morning, May 21, 2005.  AR 77-78.  No medical records reflecting this treatment are in the Administrative Record.

Describing a different incident, Sgt. Stuart alleges that on an unspecified date, he witnessed an ordnance expert and an Iraqi interpreter being killed by the bomb they were inspecting when it exploded as he accompanied them on a security detail.  Defendant denies that this occurred, and no documents in the Administrative Record independently verify this incident.[2]

---

[1] The findings of fact are derived from the Administrative Record ("AR").

[2] Sgt. Stuart also alleges that he served as a "member of the General's personal security detachment and various escort units, and participated in house-to-house searches in the region." Compl. ¶ 7.  Defendant avers that it has no knowledge of any such service, and there is no record of such service in the Administrative Record.

**Sgt. Stuart's Medical Examination Form 2173 Dated January 1, 2006**

Sgt. Stuart's unit left Iraq in late 2005, and he returned to Camp Shelby, Mississippi on December 27, 2005.  AR 71, 232.  On January 1, 2006, Sgt. Stuart underwent a medical examination at Camp Shelby.  AR 76.  The examination was documented on DA Form 2173, "Statement of Medical Examination and Duty Status."  AR 76.[3]  Capt. Moore, the examining nurse, checked the boxes on Form 2173 to indicate that Sgt. Stuart "was mentally sound," that Sgt. Stuart's unidentified injury would not likely result in a claim against the Government for future medical care, and that his injury "was incurred in line of duty."  AR 76.  As to the details of any injuries which Sgt. Stuart reported at the time, Capt. Moore noted "see Block 30."  AR 76.  Block 30 was filled out by Sgt. Stuart's Unit Commander, Col. William Glasgow, and provides:

> Service member was deployed to Kuwait and Iraq (Jan 2005 to Jan 2006).  [Service Member] was subjected to continuous operational conditions and exposure to:  human waste, indigenous plants and animals, composite material fires, petrochemical waste and fumes, gases, fumes and dust of unknown origins, continuous loud [noise] exposure >85db, blood borne pathogens, and airborne pathogens.  SM was also exposed to infectious diseases to include but not limited to the following: Leptospirosis, Leishmaniasis, Tuberculosis, Hepatitis, and Malaria.  SM was also subjected to extreme exposure to sun and ambient temperatures.  Personal hygiene with nonpotable water was conducted throughout SM[']s one year deployment.  Soldiers were required to wear body armor, ceramic ballistic plates and Kevlar continuously throughout deployment which may result in claims of knee injuries, shoulder and back pains or problems or other ailments related to continuous wear . . . .

AR 76.  Col. Glasgow and Capt. Moore characterized Sgt. Stuart's injuries as having been incurred in the line of duty.  AR 76.

On January 21, 2006, Sgt. Stuart was honorably released from active duty pursuant to Army Regulation 635-200, Chapter 4 because he had completed "required active service."  AR 232.  Sgt. Stuart's orders noted he was being released from active duty "not by reason of physical disability."  AR 234.  Although Sgt. Stuart alleges that "he was referred for further medical evaluation" at this time, the January 1, 2006 DA Form 2173 does not indicate whether Sgt. Stuart was referred for further medical care or treatment.  Compl. ¶ 10; AR 76.

**Sgt. Stuart's Service in the National Guard and Post Active Duty Medical History**

Upon release from active duty in January 2006, Sgt. Stuart returned to service in the Army National Guard.  AR 232.  Some six months later, on July 22, 2006, while in the National Guard, Sgt. Stuart met with Hankl Mazarek, a Veteran's Administration ("VA") physician's assistant, as part of the Post-Deployment Health Reassessment Screening Program.  AR 69.  As a

---

[3] The medical provider completes the first part of Form 2173, and the soldier's unit commander signs the second part.  If a medical consultation is needed, the unit commander is instructed to write "SOLDIER REQUIRES FURTHER MEDICAL EVALUATION [IN ACCORDANCE WITH] PDHRA DIRECTIVE."  PDHRA Directive MILPER Message 05-273.

result of this appointment, the Army generated a second Form 2173, Statement of Medical Examination and Duty Status, dated July 22, 2006, filled out by a physician's assistant and Sgt. Stuart's National Guard unit commander.  AR 69.  The physician's assistant wrote that Sgt. Stuart complained of "social and physical symptoms" and requested to see a medical provider. Id.  On the second half of the form, Sgt. Stuart's National Guard unit commanding officer noted that Sgt. Stuart required "further medical evaluation [in accordance with] [Secretary of Defense] PDHRA Directive MILPER Message 05-273."  AR 69.[4]  MILPER Message 05-273 provided that reserve soldiers returning from deployment in a combat zone must be evaluated by a medical provider during a post-deployment health reassessment.  If the reassessment revealed a need for a medical consultation, then a DA Form 2173, Statement of Medical Examination and Duty Status, was to be processed.  No records in the Administrative Record reflect any medical appointments or consultations between Sgt. Stuart and any medical provider until over four months later, in December 2006.

On December 4, 2006, almost 11 months after his release from active duty, Sgt. Stuart and a provider identified as Diane Gevinski, filled out DD Form 2900, entitled "Post-Deployment Health Reassessment" or "PDHRA."  AR 71-75.[5]  The purpose of the PDHRA is to assess a service member's "state of health after deployment in support of military operations and to assist military healthcare providers, including behavioral health providers, in identifying present and future medical care needs [the service member] may have."  AR 71.  On the DD 2900, Ms. Gevinski certified that the Post-Deployment Health Reassessment had been completed on December 4, 2006.  AR 74.  On the DD 2900, Sgt. Stuart indicated that he was experiencing health difficulties related to his deployment.  AR 72.  Specifically, Sgt. Stuart identified "headaches," "back pain," "chest pain or pressure," "dizziness, fainting, light headedness," "problems sleeping or still feeling tired after sleeping," "increased irritability," and "taking more risks such as driving faster" as conditions related to his deployment.  AR 72.  He also indicated that during his deployment he had been exposed to "smoke from burning trash or feces," "vehicle or truck exhaust fumes," "loud noises," "excessive vibration," "sand/dust," and "blast or motor vehicle accident."  AR 72.  Sgt. Stuart wrote that he had "persistent major concerns" about the health effects of conditions he was exposed to in Iraq, that he had nightmares about his deployment, and that he was feeling "constantly on guard or watchful" and "numb or detached from others."  AR 72-73.  Further, Sgt. Stuart answered "yes" to the question "Would you like to schedule a visit with a healthcare provider to further discuss your health concern(s)?"  AR 73.

After completing this DD Form 2900, Post-Deployment Health Reassessment, Ms. Gevinski consulted with Sgt. Stuart and confirmed that the answers that Sgt. Stuart had provided on the form were accurate.  AR 74.  On the same form, Ms. Gevinski noted that Sgt. Stuart exhibited symptoms of depression and post-traumatic stress disorder ("PTSD") that were a "Major Concern," and wrote that Sgt. Stuart was "Undercare [sic] for all issues and concerns."

---

[4]  MILPER Message 05-273 supplemented Army Regulation 600-8-4, Line of Duty Policy, Procedures, and Investigations.

[5]  The instructions on the Post-Deployment Health Reassessment Form provide that the service member was to complete the first three pages and report symptoms and concerns.  A health care provider was to complete the second half of the form.

AR 74.[6]  The form gave the health care provider the option of referring the patient to 12 different types of facilities, including "Mental Health Specialty Care," but Ms. Gevinski did not make any referrals for further treatment.  AR 74.  The record does not contain a DA Form 2173 (Statement of Medical Examination and Duty Status) generated as a result of this consultation.  Pursuant to MILPER Message 05-273, a DA Form 2173 must be processed when "THE PHDRA SCREENING REVEALS A NEED FOR MEDICAL CONSULTATION."  There is no indication in the Administrative Record that there was a review of this medical evaluation by an appropriate medical authority, as required by MILPER Message Number 05-273.

On December 26, 2006, Sgt. Stuart underwent an audiological evaluation at a VA facility where he complained of bilateral tinnitus, which he described as "cricket-like," and first noticed upon leaving Iraq.  AR 70.  Sgt. Stuart also complained at the audiological exam of having trouble sleeping, constant pressure within his inner ears, and difficulty understanding speech. AR 70.  The audiologist provided Sgt. Stuart with information to apply for a service-connected disability but did not refer him to any other treatment or provider.  AR 70.

On June 19, 2007, Dr. Terako Amison, a VA psychiatrist, diagnosed Sgt. Stuart with PTSD.  AR 14-15.  Dr. Amison treated Sgt. Stuart for PTSD through at least early July 2008. AR 5-17.

On June 29, 2007, Col. Robert May of the Mississippi National Guard completed a physical profile of Sgt. Stuart indicating that Sgt. Stuart had PTSD and was not responsive to treatment.  AR 20.  Col. May filled out similar physical profile forms in November 2007, and in February 2008, noting that Sgt. Stuart was suffering from "[m]ajor depression" and had been under care for that condition for over one year.  AR 18-19.  These physical profiles were part of a Standards of Medical Fitness assessment, completed pursuant to Army Regulation 40-501, and indicated that Sgt. Stuart had a medical condition that could prevent deployment.  Col. May answered no to the question "IS SOLDIER HEALTHY WITHOUT ANY MEDICAL CONDITION THAT PREVENTS DEPLOYMENT?"  AR 18.  In the final profile, dated February 26, 2008, over two years after Plaintiff's release from active duty, in response to a question whether the soldier met retention standards in accordance with Army Regulation 40-501, Col. May wrote: "Needs [Medical Evaluation Board]/[Physical Evaluation Board]."  AR 18.

There is a third DA Form 2173 (Statement of Medical Examination and Duty Status) in the record.  AR 181.  Section I, the portion to be completed by a health care provider, is dated July 22, 2006, as was the second DA 2173, and contains largely the same information as the first form.  Compare AR 69, with AR 181.  Specifically, Mr. Mazarek wrote that Sgt. Stuart was examined as part of the PDHRA Screening Program, reported PTSD, complained of social and physical symptoms, and wanted to see a VA medical provider.  AR 181.  Maj. Chad Gore, Sgt. Stuart's National Guard unit commander, completed Section II of the third DA 2173 on March 29, 2010, and wrote: "[Service Member] requires further medical evaluation [in accordance with Secretary of Defense] PDHRA directive MILPER Message 05-273 dated 03 Nov 05."  AR 181. Maj. Gore also checked the box indicating that the injury at issue was incurred in the line of duty.  AR 181.

---

[6] The record contains no documentation regarding Sgt. Stuart's treatment, or the identity of the care provider.

On September 25, 2009, Sgt. Stuart was honorably discharged from the Army National Guard because he had fulfilled his obligation. AR 184. The VA subsequently concluded that Mr. Stuart was 100% disabled because of his injuries. AR 21.

## The Army's Procedures on Discharge from Active Duty

Under applicable Army Regulations at the time of Plaintiff's discharge, if a soldier had a medical condition that could make him unfit for duty, then "disposition through medical channels [would take] precedence over administrative separation proceedings" such as discharge for expiration of term of service. Army Reg. 635-200 ¶ 1-33(a). Further, a soldier who had completed his term of service, but who was also physically unfit for retention, could not be separated for completion of service unless the soldier waived processing for separation due to physical disability. Army Reg. 635-200 ¶ 4-2(c).

When Sgt. Stuart was discharged, disposition through medical channels was governed by Army Regulation 635-40, Physical Evaluation for Retention, Retirement, or Separation.[7] Pursuant to that regulation, a soldier had to be discharged as physically unfit for duty when he did not meet the Army's retention standards in Army Regulation 40-501. To be eligible for a medical discharge and disability, a soldier must have sustained an injury that required separation in the line of duty. Army Reg. 635-40 ¶ 3-4. There was a presumption that a disease or injury discovered after the soldier entered active service was incurred in the line of duty. Army Reg. 635-40 ¶ 3-2(a)(2). Once a soldier was identified as potentially unfit for duty, the Army was required to make a case-by-case determination regarding whether a soldier was unfit due to disability, and to consider all relevant evidence, and make findings with respect to fitness or unfitness for military service on the basis of the preponderance of the evidence. Army Reg. 635-40 ¶ 3-1(a) and (c).

If a soldier was identified as not meeting retention standards, a Medical Evaluation Board, or "MEB," had to be convened to document a soldier's medical status and any related duty limitations. Army Reg. 40-400 ¶ 7-1. The Medical Evaluation Board, the first step in the process of evaluation for disability and separation, was composed of two or more physician members and was required to make its determination expeditiously. Army Reg. 40-400 ¶¶ 7-1 and 7-3. If the Medical Evaluation Board determined that a soldier did not meet retention standards, the soldier was to be referred to a Physical Evaluation Board. Army Reg. 40-400 ¶ 7-22. Medical Evaluation Boards were not authorized to make conclusions or findings regarding disability -- Physical Evaluation Boards were tasked with such responsibilities and were to "evaluate an individual's impairments primarily on the basis of the records." Army Reg. 40-400 ¶¶ 7-1, 7-8(c). A soldier could not receive disability payments from the military unless this process was completed. See Army Reg. 40-400, Chapter 7; Dept. of Defense Directive No. 1332.18, Nov. 4, 1996 ¶ 3.

---

[7] Army Regulation 635-40 has been amended since Sgt. Stuart's release from active duty. A copy of the regulation in effect at the time of Plaintiff's release from active duty is an attachment to Defendant's Motion for Judgment on the Administrative Record, and all references are to that version of the regulation.

The Army's Standards of Medical Fitness, set forth in Army Regulation 40-501, also delineated numerous circumstances that mandated referral to a Medical Examination Board. For instance, when a service member exhibited anxiety or dissociative disorders, referral to a Medical Evaluation Board was required if the symptoms necessitated limitation of duty or resulted in interference with effective military performance. Army Reg. 40-501 ¶ 3-33. Additionally, a soldier's unit commander was required to refer a soldier to a medical treatment facility for medical evaluation "when the soldier [was] believed to be unable to perform the duties of his or her office, grade, rank, or rating." Army Reg. 635-40 ¶ 2-9(c). Similarly, if a physician identified a soldier with a medical condition that did not meet retention standards, the physician was charged with referring that soldier to the Physical Disability Evaluation System, and a Medical Evaluation Board was mandatory. Army Reg. 40-501 ¶ 3-3(d). Army Regulation 40-400, Patient Administration, provided broader grounds for a referral, stating: "[s]ituations that require Medical Evaluation Board consideration are - [t]hose involving patients whose medical fitness for return to duty is questionable, problematical, or controversial. When a member's fitness for further military duty is questionable, it becomes essential that all abnormalities in his or her condition be thoroughly evaluated." Army Reg. 40-400 ¶ 7-5(b)(3).

### The Army's Personnel Policy Guidance

The Army's "Personnel Policy Guidance" ("PPG") containing the Army's procedures for overseeing its soldiers was in effect when Sgt. Stuart was discharged. Joint Status Report, Feb. 23, 2012. Part 7-12, which set forth the requirements for medical procedures during Release from Active Duty or "REFRAD," provided, in pertinent part:

7-12 Requirements for REFRAD/Demobilization.

a. Medical Benefits and Entitlements Briefing:

Each Soldier will receive a medical benefits and entitlements briefing. Briefing information should include, but is not limited to, the following topics:

- The right to request a REFRAD physical.
- MRP
- Tricare benefits following REFRAD.
- Points of contact for TRICARE claim issues.
- Department of Veterans Affairs (VA) access.
- Two forms must be completed: Department of Defense (DD Form 2796, Post-deployment health assessment to be completed within 5 days of redeployment or demobilization, and DD Form 2697, Report of medical assessment).
- TRICARE Reserve Select (TRS)

b. Medical Record Review:

A health care provider (physician, physician assistant, or nurse practitioner) will conduct a complete medical record review including DD Forms 2796, 2697, and 2795 (pre-deployment health assessment) and all medical records to determine if a consultation, physical examination, or further medical care is required. (Note: review of

DD Forms 2795 and 2796 may be completed [in accordance with] paragraph 3.h.(7). Personnel undergoing REFRAD, review of the DD Form 2697 and medical records must be accomplished by a physician, physician assistant, or nurse practitioner). If the Soldier has not requested a separation physical and the medical review of the Soldier's documentation does not indicate a need for a physical exam, then a physical exam is not required. The health care provider at the demobilization site will determine if follow-on medical care is required and initiate the appropriate referral.

 c. DA Form 2173:

 The health care provider will ensure part I of DA Form 2173, statement of medical examination and duty status, was initiated at the time of treatment to include in country (AOR) for each injury and/or disease (to include those related to dental care). This form is utilized to document line of duty determination.

 (1) If a DA Form 2173 is required and none is present, the health care provider will initiate one at the time of the medical/dental out-processing. The DA Form 2173 will then be forwarded to the RC Soldier's unit for completion. AR 600-8-4, Line of Duty Policy . . .

. . .

 f. Medical Health Record:

 The original DD Forms 2795, 2796 and 2697, as well as any completed DA Form 2173 will be placed in the Soldier's health record. All documentation related to medical treatment received during the period of active duty (ad) will be included in the health record which will be forwarded back to the appropriate records custodian at the service member's unit.

 (1) A copy of all DA Form 2173s and DD Form 261s will be given to the Soldier for his/her personal records.

 (2) A copy of DD Form 2796 will be sent to the Army Medical Surveillance Activity (AMSA) per paragraph 3.h.(8).

. . .

 h. Medical Retention Standards:

 All RC Soldiers who do not meet the medical retention standards of AR 40-501, chapter 3, must be referred to a medical evaluation board/physical evaluation board (MEB/PEB). If it is determined that the condition is pre-existing without permanent service aggravation, the service member may still be covered for disability severance or retired pay if the Soldier has accumulated 8 years of AD. To be eligible for this benefit, the Soldier must have his PEB completed prior to release from AD.

PPG 7-12.

The PPG set forth the policies governing how the Army would handle medical treatment for its active duty soldiers. Part 7-2(i) of the PPG read, "All episodes of health care will be documented in the individual's permanent or deployment health record while participating in contingency operations." PPG ¶ 7-2(i). Paragraph 7-8(b) required that Form 2796, Post-Deployment Health Assessment, "[m]ust be completed in the theater of operation prior to redeployment, ideally within 5-days but not more than 30-days, before departure from theater." PPG ¶ 7-8(b). This requirement applied to reserve component soldiers "activated to active duty status greater than 30 days in support of any contingency operation." Id. Finally, the PPG required that service members deployed overseas receive their Post-Deployment Health Assessment at the deployment platform. PPG ¶ 7-11(a).

## Discussion

Plaintiff claims that he was wrongfully discharged from active duty resulting in a denial of military pay. Specifically, Mr. Stuart alleges that he was injured while on active duty and as a result, was suffering from traumatic brain injury, malfunction of his acoustic nerve, and PTSD at the time of his discharge. Plaintiff further alleges that despite his injuries, "a mandatory Medical Evaluation Board (MEB) was never convened for further evaluation of his condition and [Plaintiff] was never referred into the physical disability evaluation system as prescribed by Army Regulation 40-400, § 7-1, and 40-501, ¶ 3-33 . . . ." Compl. ¶ 16. Plaintiff argues that if the Army had evaluated him as required when he returned from Iraq, he would have been referred to the Medical Examination Board and been retained in service until a disability determination was made. Plaintiff seeks pay and allowances, out of pocket expenses for medical care, and restoration of active duty status until his disability case is decided by the Army.

## Standard Of Review

When the Court resolves a motion for judgment on the administrative record, "the court must determine whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Stine v. United States, 92 Fed. Cl. 776, 791 (2010) (internal quotations omitted). "The Court of Federal Claims . . . is required to make factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Bannum, Inc. v. United States, 404 F.3d 1346, 1357 (Fed. Cir. 2005). Judicial review is limited to the administrative record already in existence. Boyer v. United States, 81 Fed. Cl. 188, 191 (2008).

"A decision by a branch of the military to discharge an officer comes before [the Court] with a limited standard of review. The former service member must establish that the military's decision to separate him or her was arbitrary, capricious, unsupported by substantial evidence, or contrary to law." Sobczak v. United States, 93 Fed. Cl. 625, 632 (2010), aff'd, 415 F. App'x 247 (Fed. Cir. 2011) (citing Martinez v. United States, 333 F.3d 1295, 1314 (Fed. Cir. 2003)). The Court is not to substitute its judgment for that of the military officials who made the discharge decision because determining who is fit or unfit to serve in the armed services is not the province of the judiciary. See Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983). Furthermore, "military administrators are presumed to act lawfully and in good faith . . . and the military is entitled to substantial deference in the governance of its affairs." Dodson v. United States, 988 F.2d 1199, 1204 (Fed. Cir. 1993). When "reasonable minds could reach different

conclusions from the same evidence, the Court will not substitute its judgment." See Hwang v. United States, 94 Fed. Cl. 259, 269 (2010) (citations omitted).

The military is a "specialized community governed by a separate discipline from that of the civilian." Murphy v. United States, 993 F.2d 871, 872 (Fed. Cir. 1993) (quoting Orloff v. Willoughby, 345 U.S. 83, 93–94 (1953)). As a result, courts do not interfere with legitimate military matters. Id. (citations omitted). Concerns regarding the separations of powers limit the judicial branch's ability to oversee military matters. Id. at 872–73. To be mindful of these concerns, courts have held that judicial review of military decisions is limited to situations where the Secretary's discretion is constrained and there are tests and standards to measure the service branch's conduct. See Adkins v. United States, 68 F.3d 1317, 1323 (Fed. Cir. 1995); Murphy, 993 F.2d at 873.

Courts may review military decisions when a plaintiff argues that the military did not comply with a governing statute or regulation. See Roth v. United States, 378 F.3d 1371, 1385 (Fed. Cir. 2004); see also Wells v. United States, 46 Fed. Cl. 178, 183 (2000) (remanding to Army Personnel Command when the Army failed to follow mandatory procedures during a line of duty investigation); French v. United States, 42 Fed. Cl. 49, 55 (1998) (stating the court would not review the evidence and findings of the corrections board to evaluate the board's decision but would determine if the board failed to comply with its own directives); Ferrell v. United States, 23 Cl. Ct. 562 (1991) (adjudicating whether the Army followed the required procedures for discharge). Similarly, courts will consider whether the military decision was adequately supported or justified. See Rominger v. United States, 72 Fed. Cl. 268, 273 (2006) (remanding a case when the corrections board did not explain why the Army would not reconsider the disability standard it used).

## The Army Did Not Follow Its Regulations Requiring Documentation of Medical Treatment When Plaintiff Was Injured While on Active Duty

Contrary to the Army's PPG, the Army failed to document treatment Sgt. Stuart sought or received after the IED incident. "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." Morton v. Ruiz, 415 U.S. 199, 235 (1974); see, e.g., Service v. Dulles, 354 U.S. 363, 388 (1957); Wagner v. United States, 365 F.3d 1358, 1361 (Fed. Cir. 2004); Vogue v. United States, 844 F.2d 776, 779 (Fed. Cir. 1988). The record contains DA Form 2823, dated June 25, 2005, a sworn statement from Sgt. Dennis Adams, Sgt. Stuart's superior, documenting the IED incident on May 20, 2005. AR 77-78. The only reference to Sgt. Stuart's medical condition and treatment occurs in the last sentence of the statement, where Sgt. Adams relates that Sgt. Stuart sought medical treatment at the Battalion Aid Station the next morning "complaining of headache, very loud ringing in the ears, and hearing loss." AR 77. There is no document in the record reflecting such medical treatment. As Defendant admits:

> On May 20, 2005, an improvised explosive device detonated under Mr. Stuart's convoy. AR 77-78. While other members of the convoy set up security around the area of the explosion, Mr. Stuart helped to stabilize and evacuate an injured soldier. AR 77. The following morning, Mr. Stuart and two others involved in the attack complained of headache, ringing in the ears, and hearing loss to the unit

aid station. *Id.* Mr. Stuart's official military record lacks certain documentation regarding this incident. Specifically, no Line of Duty report was completed and no documentation establishes whether combat action badges or purple hearts were awarded.

Def.'s Mot. 2. The record also contains DA Form 2173 (Statement of Medical Examination and Duty Status) dated January 1, 2006, several months after the May 5, 2005 IED incident, but this form does not appear to address the IED incident. AR 76. This Statement of Medical Examination and Duty Status, indicating that Sgt. Stuart was injured in the line of duty, was filled out by Capt. Troy Moore, but the only medical injuries described are generalized potential injuries listed in Block 30 -- knee, shoulder, and back pain, or other similar problems related to continuously wearing body armor and being exposed to dire combat conditions including fumes, pathogens and infectious diseases. AR 76. The form does not reference the IED incident or any injuries related to it. Block 30 indicates that Sgt. Stuart was exposed to human waste, indigenous plants and animals, composite material fires, petrochemical waste and fumes, gases, and dusts of unknown origins, continuous loud noise exposure, blood- and air-borne pathogens, infectious diseases, extreme sun and ambient temperatures. AR 76. Defendant characterizes Block 30 as "boilerplate language describing deployment conditions." Def.'s Mot. for J. on the AR 3; Def.'s Reply 3. The Army's failure to document Sgt. Stuart's medical treatment following the IED incident violated PPG ¶ 7-2(i), which requires documentation of "all episodes of healthcare" in the individual's permanent or deployment health record while participating in contingency operations. PPG ¶ 7-2(i).

## The Army Violated Its Procedures in Releasing Sgt. Stuart from Active Duty

The Army failed to follow its procedures by not providing Plaintiff a timely Post-Deployment Health Reassessment, as required by MILPER Message 05-273 and Chapter 7 of the PPG. Specifically, MILPER Message 05-273 provides that every soldier returning from a combat zone must be evaluated by a medical provider in a Post-Deployment Health Reassessment. The PPG amplifies this requirement, stating that the health assessment must be completed no more than 30 days before, but ideally within five days before, departure from theater. PPG ¶ 7-8(b). The PPG requires the Army to ensure that service members who are redeployed from overseas receive the health assessment at the deployment platform. PPG 7-11. A soldier's deployment health record and Post-Deployment Health Assessment are to be integrated into the soldier's permanent health record. The PPG also requires that each soldier receive a medical benefits and entitlements briefing, and be informed of his right to request a physical examination. PPG 7-12. Sgt. Stuart was redeployed from Iraq in December of 2005, and the Army failed to conduct a Post-Deployment Health Assessment, failed to brief Sgt. Stuart about his medical benefits and entitlements, and failed to integrate any such health assessment into his permanent health record. Sgt. Stuart was released from active duty on January 21, 2006, and returned to the Reserves. Plaintiff did not receive any treatment until July 22, 2006, some six months after he had been discharged from active duty.

Defendant admits that it did not conduct a Post-Deployment Health Reassessment within the required time period or inform Sgt. Stuart of his right to request a physical examination but contends that these failures should not be detrimental to its case. Defendant argues:

The Army did not conduct a [Post-Deployment Health Assessment] within five days of redeployment nor did it appear that it briefed Mr. Stuart regarding his right to request a [Release from Active Duty] physical. However, the Army did conduct deployment related medical assessments of Mr. Stuart.  In light of these evaluations and the substantial record evidence supporting that Mr. Stuart successfully performed his duties during his active duty service, the Army's oversight does not necessitate a finding that Mr. Stuart should have been referred to a medical evaluation board prior to his release from active duty service.

Def.'s Reply 2 (citing AR 71-76, 81-82); see also Def.'s Supp. Br. 6.

Defendant identifies two such "deployment related medical assessments" that it did conduct -- the January 1, 2006 examination at Camp Shelby and the December 4, 2006 Post-Deployment Health Assessment.  Defendant's assertion that the Army "conduct[ed] deployment related medical assessments" is not supported by the record.  Defendant ignores the fact that the January 1, 2006 examination resulted in a DA Form 2173 (Statement of Medical Examination and Duty Status), which contains no discussion of any injuries or symptoms specific to Plaintiff. AR 76.  Rather, it contains language describing the conditions that service members in Iraq were generally exposed to -- language that Defendant characterized as "boilerplate," and made no mention of the IED incident.  The second alleged "deployment related medical assessment" cannot be accurately characterized as "deployment related" as it was not performed until December 2006, almost a year after Sgt. Stuart returned from Iraq, long after the five to 30-day required timeframe for such an assessment.  Importantly, this December 2006 medical assessment identified Plaintiff's major health concerns, but did nothing to address them.  Sgt. Stuart voiced "persistent major concerns" about the health effects of the conditions he experienced in Iraq and requested a follow-up visit with a health care provider.  The provider conducting the assessment, Ms. Gevinski, wrote that Sgt. Stuart exhibited symptoms of depression and PTSD that were a "major concern," but did not make any referrals.  No DA Form 2173 was generated, and the first indication that Plaintiff received a mental health evaluation came almost seven months later when a VA psychiatrist diagnosed him with PTSD.  AR 14-15, 74.

Contrary to Defendant's assertions, the Army's violations here had significant ramifications for Sgt. Stuart.  Plaintiff argues that a post-deployment physical would have revealed his injuries, including PTSD, and he would have been referred to a Medical Evaluation Board and Physical Evaluation Board and found to be disabled before he was discharged.  While this Court cannot make any findings as to what Plaintiff's injuries may have been some seven years ago, it is clear that the lack of medical examination and records prevented the Army and Plaintiff from learning what Plaintiff's medical condition was at the time of his discharge. Because the Army did not follow its procedures, Mr. Stuart may have been discharged on the wrong ground -- completion of service instead of disability -- and at the wrong time -- before his medical condition was known.

Army Regulations provide that absent circumstances not present here, discharge through medical channels takes precedence over administrative discharge, even if the service member has completed his term of service.  Army Reg. 635-200 ¶¶ 1-33(a) and 4-2(c).  This means that the Army is required to resolve questions concerning a soldier's medical condition before addressing other reasons for discharge.

When a service member does not meet the Army's retention standards due to a medical impairment, referral to a Medical Evaluation Board is mandatory.  Army Reg. 40-400 ¶ 7-1. Psychological problems, such as anxiety and dissociative disorders, which Plaintiff exhibited during the Post-Deployment Health Reassessment he received months later from the VA, would have been grounds for referral to a Medical Evaluation Board.  AR 69; Army Reg. 40-501 ¶ 3-33.  Further, after the IED incident, Sgt. Stuart suffered headaches, ringing ears, and hearing loss, which Plaintiff characterizes as "hallmarks of traumatic brain injury."  Pl.'s Opp'n to Def.'s Mot. and Cross Mot. for J. on the AR 4, 5 (citing AR 77-78).  These impairments were later documented, and might have been cause for referral to a Medical Evaluation Board had they been diagnosed before Sgt. Stuart was discharged.  Army Reg. 40-501 ¶¶ 3-9(b), 3-30(j). However, the Army discharged Sgt. Stuart from active duty without processing him through medical channels.  If Sgt. Stuart had been referred to a Medical Evaluation Board, he would have continued to receive active duty pay while the Army determined if he should be medically discharged.  Finally, the Army's failure to refer Plaintiff to a Medical Evaluation Board deprives Plaintiff of any contemporaneous documentation of his condition at the time of discharge.

Defendant maintains that Plaintiff's claim should be denied because Plaintiff cannot prove that he was unfit for active duty at the time of discharge.  This argument ignores the fact that it is Defendant, not Plaintiff, that is the cause of the dearth of evidence.  To deny Plaintiff's claim for lack of proof that he was unfit at the time of discharge would reward Defendant for failing to perform and document required medical evaluations and would unfairly impose an impossible evidentiary burden on Plaintiff.  Defendant admittedly failed to create the only documentation that could have addressed Plaintiff's fitness for duty and met that evidentiary burden.

Defendant, relying on personnel performance records and ignoring its failure to document Plaintiff's medical condition following the IED incident, asserts that because Sgt. Stuart was able to perform his duties effectively, he did not meet the criteria for referral to a Medical Examination Board at the time that he was discharged from active duty.  Def.'s Reply 5-8. However, these personnel performance evaluations do not constitute sufficient evidence of Plaintiff's <u>medical</u> condition here.  In short, these performance reviews cannot pass as a substitute for the medical evaluations Defendant failed to do.  The Army prevented Plaintiff from proving whether he was fit for active duty at the time of his discharge by failing to provide the required medical evaluations and documentation both at the time Plaintiff's vehicle was hit by the IED, and again at the time of his redeployment.

The Court will not speculate that Plaintiff met retention standards when he was discharged merely because the Army's failure to follow its procedures resulted in a lack of evidence to the contrary.  <u>See</u> <u>Ferrell</u>, 23 Cl. Ct. at 570 (rejecting the Air Force's argument that a former serviceman should be presumed fit at time of discharge when the Air Force violated its regulations by not placing the service member on a medical hold and not convening a Medical Examination Board).  The <u>Ferrell</u> Court rejected the Government's argument that the absence of a disability in the plaintiff's medical records showed that he was not disabled when discharged, stating:

> Based on an anemic record, the Air Force retreats into a presumption of fitness, and a presumption of correctness of the [Physical Evaluation Board's] unexplained finding.  Yet it is the agency's own procedural errors which put

> plaintiff into a position of having to overcome this presumption. That the failure
> to convene an MEB after a period of convalescence was prejudicial is in fact
> conceded by the first AFBCMR report: "Since there was no [Medical Evaluation
> Board], no official determination could be made concerning his qualification for
> duty or whether or not referral to a [Physical Evaluation Board] was appropriate."

Id.  Similarly, the "anemic record" in this case does not support a presumption that Plaintiff was
fit for duty at the time of his discharge or provide a sufficient factual predicate for this Court to
accept Defendant's determination of Plaintiff's fitness for duty.

### Remand to the Army Board for the Correction of Military Records

The Tucker Act gives the Court of Federal Claims the authority "to remand appropriate
matters to any administrative or executive body or official with such direction as it may deem
proper and just."  28 U.S.C. § 1491(a)(2) (2000); see RCFC 52.2; accord Harris v. United States,
8 Cl. Ct. 299, 303 (1985).  Under, Rule 52.2, "[a]n order of remand shall (A) delineate the area
of further consideration or action deemed warranted on the remand, (B) fix the duration of the
remand period, not to exceed 6 months, and (C) specify the extent to which court proceedings
shall be stayed during the remand period."  RCFC 52.2(a)(2).  "Any remand must be consistent
with the statutory scheme under which the agency has taken action."  Richey v. United States,
322 F.3d 1317, 1323 (Fed. Cir. 2003).  The Court is not given "unlimited authority to require
subordinate bodies to conduct investigations and find facts."  Id.

As the Supreme Court has explained:

> If the record before the agency does not support the agency action, if the agency
> has not considered all relevant factors, or if the reviewing court simply cannot
> evaluate the challenged agency action on the basis of the record before it, the
> proper course, except in rare circumstances, is to remand to the agency for
> additional investigation or explanation.  The reviewing court is not generally
> empowered to conduct a de novo inquiry into the matter being reviewed and to
> reach its own conclusions based on such an inquiry.

Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985).

Remand is proper in this case because the record before the agency is inadequate to
support the Army's conclusion that Sgt. Stuart was properly discharged for completion of
service.  The Army failed to conduct a Post-Deployment Health Reassessment, which would
have indicated whether Sgt. Stuart should have been referred to a Medical Evaluation Board
before he was discharged, and it is unclear what Sgt. Stuart's condition was at that time.  This
error is compounded by the Army's failure to document Sgt. Stuart's medical condition during
his deployment.

It is the Army's province not the Court's to determine whether Plaintiff was fit for duty
when he was discharged from active duty.  The Court does not sit as a "super correction board"
and it is not empowered to engage in a de novo review of Plaintiff's fitness for duty.
Determinations concerning who is fit or unfit to serve in the military are matters for the military.
See Orloff v. Willoughby, 345 U.S. 83, 93-94 (1953) ("[J]udges are not given the task of running
the Army . . . Orderly government requires that the judiciary be as scrupulous not to interfere

with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters."). The Board is authorized by statute to correct any military record upon a finding of error or injustice warranting relief. 10 U.S.C. § 1552 (2006). The Board has broad authority to correct a service member's military record and attempt to place the service member in the position that he would have been in but for the injustice or error. See Porter v. United States, 163 F.3d 1304, 1311 (Fed. Cir. 1998); Dolan v. United States, 91 Fed. Cl. 111, 122 (2010).

The Court recognizes that seven years have passed since the Army failed to evaluate Plaintiff's fitness for duty at the time of discharge, and it may be difficult to reconstruct Plaintiff's medical condition post hoc. However, this difficulty is not insurmountable and does not prevent the Court from directing the Army Board for Correction of Military Records to assess Plaintiff's medical condition at the time of his discharge. Indeed, the military has been required to reconsider and make disability-at-time-of-separation determinations years after a service member's discharge. See Walden v. United States, 22 Cl. Ct. 532 (1991) (remanding to the Army Board for the Correction of Military Records with the instruction to decide post hoc if plaintiff was suffering from PTSD when he was discharged, and the Army's failure to properly evaluate plaintiff's "physical condition upon separation from the service was in error and unjust."); see also Wells, 46 Fed. Cl. at 186 (stating "if, on remand, key medical documents and testimony are now demonstrably unavailable, it will be incumbent on the Army to determine . . . whether the [line of duty inquiry] was fatally flawed by the [investigating officer's] failure to pursue this information on a timely basis."). Similarly, in Walters v. United States, 175 Ct. Cl. 215, 225 (1966), the Court of Claims found that a plaintiff's claim for improper discharge could be reviewed years after the fact, stating:

> The petitioner may prevail if he can show that if the complete facts concerning his condition had been known at the time he would have been entitled to retirement by reason of physical disqualification under the pertinent laws and regulations . . . . To this end, reference must of necessity be made to his subsequent medical history insofar as it sheds light on the nature of his physical condition while in service. Evidence of progressive deterioration and later discovered symptoms and disabilities may be decisive if it can establish that plaintiff's incapacity while in service was substantially more serious than suspected and that previous diagnoses were inadequate or incorrect.

Consistent with this precedent, this Court directs the Army Board for the Correction of Military Records to determine Plaintiff's fitness for duty at the time of discharge.

### Conclusion

Plaintiff's Cross-Motion for Judgment on the Administrative Record is **GRANTED IN PART**. Defendant's Motion for Judgment on the Administrative Record is **DENIED**.[8]

The Army did not comply with its procedures when it released Sgt. Stuart from active duty and failed to conduct a Post-Deployment Health Reassessment, to document medical

[8] In a joint status report, Defendant stipulated that it would agree to voluntarily remand this matter to the Army Board for Correction of Military Records, but Plaintiff was not amenable to such a remand. Joint Status Report 1, Jul. 24, 2012.

15

treatment provided during his tour of duty, to inform Plaintiff of his right to request a physical examination, and to determine if Plaintiff needed to be referred to a Medical Evaluation Board.

The Court **REMANDS** this matter to the Army Board for Correction of Military Records for further administrative action pursuant to RCFC 52.2 and orders:

1. Plaintiff shall submit all documentation that he believes supports his position that he was entitled to a Medical Evaluation Board prior to his separation from active duty to Defendant for transmission to the Army Board for Correction of Military Records within 30 days of the date of this opinion.

2. The Army Board for Correction of Military Records is directed to reassess Plaintiff's separation from active duty and determine whether Plaintiff should have been discharged due to medical disability in accordance with the Army's regulations.  Such regulations include but are not limited to 40-400, Patient Administration, and 635-40, Physical Evaluation for Retention, Retirement, or Separation.  Army Regulation 635-40 has been amended since Sgt. Stuart's release from active duty.  The Board shall apply the version of Army Regulation 635-40 in effect when Plaintiff was discharged from active duty in January 2006.

3. The Board shall determine whether referral to a Medical Evaluation Board and potentially a Physical Evaluation Board is appropriate at this time, and document the rationale for its determination.

4. In the event that the Army Board for Correction of Military Records and/or a Medical Evaluation Board and/or a Physical Evaluation Board determine(s) that Plaintiff was unfit for duty at the time of his discharge, the Board shall identify the date on which Plaintiff would have been discharged from active duty due to disability.  This will require the Army Board for the correction of Military Records to determine how many days it would have taken to perform the requisite Post-Deployment Health Reassessment, any follow-up evaluations by a Medical Evaluation Board and/or Physical Evaluation Board, and any other requisite actions before discharging Plaintiff.

5. Defendant shall provide the Court with the Army Board for Correction of Military Records' decision within **180 days** of this opinion.

6. The case is **STAYED** for the duration of remand proceedings.  The Court defers Plaintiff's other requests for relief until after the Army Board for Correction of Military Records renders a decision.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**